UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. _____

ALAN WIEGAND and KIMBERLY
SCHULTZ-WIEGAND, Individually and as
Personal Representatives of the Estate of
Chloe Wiegand, deceased minor,

      Plaintiffs,

v.

ROYAL CARIBBEAN CRUISES LTD.,

      Defendant.

_____/

## **WRONGFUL DEATH COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs hereby sue Defendant and allege:

### **PRELIMINARY ALLEGATIONS**

1.  Plaintiff, ALAN WIEGAND ("Mr. Wiegand"), is a citizen of Indiana and the father of
Chloe Wiegand (at times "Chloe" or "Decedent"), deceased.

2.  Plaintiff, KIMBERLY SCHULTZ-WIEGAND ("Mrs. Schultz-Wiegand"), is a citizen of
Indiana and the mother of Chloe.

3.  Plaintiffs, Mr. Wiegand and Mrs. Schultz-Wiegand, are the personal representatives of the
Estate of Chloe Wiegand.

4.  Defendant, ROYAL CARIBBEAN CRUISES LTD., is a foreign entity incorporated in the
Republic of Liberia, with its principal place of business in Miami, Florida.

5.  The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28
U.S.C. § 1332.  In the alternative, if diversity jurisdiction does not apply, then this matter falls
under the admiralty and maritime jurisdiction of this Court.

6. At all times material hereto, Defendant, personally or through an agent:

    a. Operated, conducted, engaged in or carried on a business venture in this state and/or county or had an office or agency in this state and/or county;

    b. Was engaged in substantial activity within this state;

    c. Operated vessels in the waters of this state;

    d. Committed one or more of the acts stated in Florida Statutes, Sections 48.081, 48.181 or 48.193;

    e. The acts of Defendant set out in this Complaint occurred in whole or in part in this county and/or state; and

    f. The cruise line ticket for Plaintiffs requires that suit be brought in this Court against the named Defendant in this action.

7. At all times material hereto, Defendant is subject to the jurisdiction of the Courts of this state.

8. At all times material hereto, the causes of action asserted in this Complaint arise under the general maritime law of the United States, with damages supplemented by the law of Puerto Rico, where the death occurred.

## FACTS COMMON TO ALL COUNTS

9. At all times material hereto, Defendant owned, operated, managed, maintained, controlled, and/or had exclusive custody of the *Freedom of the Seas* ("the vessel").

10. On or about July 7, 2019, Mr. Wiegand, Mrs. Schultz-Wiegand, Chloe, Chloe's brother, and Mrs. Schultz-Wiegand's mother and stepfather, Salvatore Anello ("Mr. Anello") (at times collectively referred to as "the family"), were fare-paying passengers, along with several other family members aboard the vessel, which was docked in the Port of San Juan, Puerto Rico.

## **Subject Incident**

11. On or about July 7, 2019, at approximately 1:15 p.m., the family boarded the vessel in San Juan, Puerto Rico for a 7-night Southern Caribbean cruise.  Upon boarding, the family went to the Windjammer Café for lunch.   After lunch, Mrs. Schultz-Wiegand and Chloe changed into swimsuits, and at approximately 2:40 p.m., they began to play in the pool(s) aboard the ship.

12. At or around 3:50 p.m., Mrs. Schultz Wiegand needed to go help with an issue related to the cruise, and as such, Mr. Anello came up to the H2O Zone on Deck 11 of the vessel to supervise Chloe, his 18-month-old granddaughter, as shown below:



13. The H2O Zone is advertised by Defendant to be a "kids'… water park[.]"

L I P C O N ,   M A R G U L I E S ,   A L S I N A   &   W I N K L E M A N ,   P . A .
W W W . L I P C O N . C O M

14. At all times material, Mr. Anello was closely supervising Chloe as she played in the kids' water park.  Shortly after 4 p.m., Chloe walked over to a nearby wall of glass on the same deck (Deck 11), and she was followed closely by Mr. Anello.

15. The wall of glass featured three rows of glass, floor to ceiling, with a wooden rail between the middle and bottom rows, as depicted below:









16. Unknown to Mr. Anello at that time, this was not, in fact, a wall of fixed glass. Instead, some of the glass panes in the middle row had the ability to be (and remain) slid opened by **_anyone_**, including other passengers. Specifically, every other glass pane in the middle row contained a sliding mechanism that allowed anyone, including other passengers, to slide and leave the glass pane open.

17. There was not a single, adequate indication that this wall of glass panes was not actually a wall of fixed glass panes, but instead a wall of glass with glass panes that could actually slide and remain open, as windows. For instance, none of the glass panes, which were mere feet from the kids' H2O Zone, contained a warning, design decal on the glass, or anything to warn passengers, such as Mr. Anello, of the hidden danger that some of the glass pane windows in the middle row may be slid open.

18. In addition, the wooden rail located between the middle and bottom rows was approximately 18 inches in from the glass pane window.  Due to the distance between Mr. Anello standing at the wooden rail and the glass pane 18 inches in front of him, it was not apparent to Mr. Anello that the glass pane in front of him was, in fact, a window that had been slid all the way open so that there was no glass at all in the single frame in front of him.  A photograph depicting the distance between the window and the railing is below:



19. Consequently, when Chloe approached the wall of glass, Mr. Anello reasonably believed that this was a wall of fixed glass with no openings.

20. Upon reaching this wall of glass, Chloe asked to be lifted up so that she could bang on the glass of the window, as Chloe frequently did at her older brother's hockey games.  Mr. Anello then lifted Chloe up onto the railing and held Chloe while she leaned forward to bang on the glass that Mr. Anello and Chloe thought to be in front of them.  As Chloe leaned forward, however, there was no glass in the frame in front of her, and she slipped from Mr. Anello's arms, falling through the open pane and down approximately 150 feet below onto the Pier in San Juan, resulting in her death.

21. An inspection of the scene after the subject incident revealed that all the glass panes around the single open pane of glass were closed and that this was the only single pane, among dozens of panes, that was slid completely open.

22. While some who are uninformed may initially characterize this type of incident as a "freak accident," it is, in fact, quite common.  In fact, this type of risk was, at one time, a common enough hazard that there were numerous industry standards put in place to prevent this very type of incident.  Yet, at all times material hereto, the middle row of the glass wall aboard the vessel violated national and international codes, standards, guidelines, and recommendations applicable to windows, including, but not limited to, industry standards set forth by the ASTM International[1] ("ASTM"), other cruise lines, and other cruise ships owned and operated by Defendant itself.

**Industry Standard – ASTM International**

23. In the early 1990s, the Consumer Product Safety Commission ("CPSC") reported a high percentage of fatalities and injuries related to falls from windows.  Specifically, according to the

---

[1] Formerly known as American Society for Testing and Materials.

CPSC, approximately eight children under age 5 die each year from falling out of a window, and more than 3,300 are injured seriously enough to go to the hospital.  More recent statistics compiled by the National Safe Kids Campaign indicate that approximately 4,700 children are injured annually in the United States following a fall from a window, and approximately 18 children per year die from such falls.

24. In response, the ASTM formed a Window Fall Prevention subcommittee.  The committee was tasked with creating standards for use in legislation, building codes, and educating individuals. The committee also addressed the implementation, requirements, installation, and testing of window fall prevention devices.

25. In 2000, the ASTM implemented new safety standards for window guards to ensure that guards are strong enough to prevent falls.

26. For instance, ASTM standards, including F2006 and F2090, address safety standards for window protection and provides three types of window fall prevention devices:

    a. *Fall prevention window guard:* Device designed to fit into or onto a window to prevent a child from passing or falling through an open window. Typically mounted on the interior frame of the window and includes side frames fastened to the sides of a window frame and a plurality of spaced-apart, transverse, tubular, width-adjustable crosspiece elements to form a grid pattern between the side supports to prevent passage of a child.

    b. *Window fall prevention screen:* Screen device designed to fit into or onto a window to prevent a child from passing or falling through an open window. Typically mounted on the exterior surface/frame of a sliding style window and on the interior of a cranking style window and includes screening mesh or material and attachment mechanism(s)

of sufficient strength to meet the performance requirements of this standard while preventing passage of a child.

c. *Window opening control device:* Device that limits a window sash to be opened with normal operation of the sash such as to prohibit the free passage of a 4-in. (102-mm) diameter rigid sphere at the lowest opening portion of the window opening, with a release mechanism that shall allow the sash to be opened to a large opening area such as that required for emergency escape and rescue, and that automatically resets when a window is fully closed.

27. At all times material hereto, Defendant knew or should have known of the industry standard set forth by above ASTM standards, yet Defendant's vessel was not in compliance with such standards, despite the fact that construction for the subject vessel began in or around 2004, and the vessel was later refurbished in 2015 – well after the above ASTM standards were implemented.

### Industry Standard – Other Cruise Lines' Vessels

28. Other cruise lines comply with the same ASTM standards and/or similar standards in order to protect passengers generally, and children specifically, from injuries and/or deaths related to falls from windows.

29. For instance, the glass panes on the pool deck aboard Carnival's vessel(s) do not open at all, as depicted below from the *Carnival Breeze*:





30. In addition, the glass panes on the pool deck aboard NCL's vessels do not open at all either, and they do not contain openings of more than four inches, as depicted below from the *Norwegian Epic*:



31. At all times material hereto, Defendant knew or should have known of the industry standard set forth by other cruise lines, including, but not limited to, Carnival and NCL, yet Defendant's vessel was not in compliance with such standards.

### Industry Standard – Defendant's Other Vessels

32. Notably, Defendant's newer vessels <u>do</u> comply with the foregoing industry standards by having glass panes that do not open in the same or similar water park area for children.  For instance, as depicted below, the glass panes near the water park aboard the *Anthem of the Seas* do not open at all:



33. The fact that Defendant's newer vessels comply with industry standards on windows, including the *Anthem of the Seas*, serves as evidence that Defendant knew or should have known of the foregoing industry standards set forth by the ASTM and/or other cruise lines.

## COUNT I – GENERAL NEGLIGENCE

The Plaintiffs re-allege, adopt and incorporate by reference the allegations in paragraphs one (1) through thirty-three (33) as though alleged originally herein.

34. At all times material hereto, it was the duty of Defendant to provide Plaintiff with reasonable care under the circumstances.

35. On or about July 7, 2019, Defendant and/or its agents, servants and/or employees breached its duty through the following acts and/or omissions:

    a.  Failure to provide reasonably safe children entertainment areas, including reasonably safe windows in such areas, which would prevent small children and other passengers from falling through the subject window; and/or

    b.  Failure to adequately mark the open windows so that they are apparent to passengers at all times of the day; and/or

    c.  Failure to use adequate signage and/or visual cues to alert passengers as to window(s) that have been left fully opened; and/or

    d.  Failure to install safety prevention devices on windows, including, but not limited to, screens, bars, and/or locking devices so that the windows are limited to a reasonable degree of opening; and/or

    e.  Failure to determine and eliminate the apparent danger from a window that can open more than four inches, especially in light of the proximity to a designated children's area; and/or

    f.  Failure to use a reasonably safe design for the windows in children areas, including the subject area where the Decedent fell; and/or

g. Failure to ascertain the cause of prior similar accidents occurring on any of Defendant's vessels, fleet wide, so as to take adequate measures to prevent their reoccurrence, and more particularly this accident; and/or

h. Negligently designing, selecting, and/or approving the window scheme in the subject area, which did not allow for appreciable perception of whether certain window(s) were open; and/or

i. Failure to incorporate applicable standards, including the ASTM and/or other industry standards, to windows on the subject vessel, including, but not limited to, installing fall prevention window guards, window fall prevention screen, and/or window opening control device; and/or

j. Violating the International Safety Management Code's goals and intent and failing to properly, adequately and safely implement the International Safety Code Management, and by extension, its own SQM Manual.

36. The above acts and/or omissions caused and/or contributed to Chloe's untimely death because the subject incident would not have occurred but for such acts and/or omissions.

37. At all times material hereto, Defendant knew of the foregoing conditions causing Plaintiff's incident and did not correct them, or the conditions existed for a sufficient length of time so that Defendant, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.  This knowledge was or should have been acquired through Defendant's maintenance and/or inspections, prior incidents, and the reasons alleged in the paragraphs entitled, "Industry Standard…," above.

38. As a direct and proximate result of Defendant's negligence,

a.  Decedent was injured about her body and extremities, suffered physical pain and suffering, mental anguish, and died;

b.  Decedent's estate lost earnings of the Decedent and lost the benefit of the prospective net accumulations, which might reasonably have been expected but for the Decedent's death.

c.  The beneficiaries/survivors of the Decedent incurred funeral expenses, suffered loss of financial support, loss of services, lost past and future wages, future loss of support and services, loss of inheritance, sustained mental pain and suffering and loss of the Decedent's companionship and protection, and suffered moral damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendant for all damages recoverable by law and demand a jury trial of all issues so triable.

## COUNT II – NEGLIGENT FAILURE TO MAINTAIN

The Plaintiffs re-allege, adopt and incorporate by reference the allegations in paragraphs one (1) through thirty-three (33) as though alleged originally herein.

39.  At all times material hereto, it was the duty of Defendant to provide Plaintiff with reasonable care under the circumstances.

40.  At all times material hereto, it was the duty of Defendant to maintain the windows aboard the vessel, including the Deck 11 windows, in a reasonably safe condition.

41.  On or about July 7, 2019, Defendant and/or its agents, servants and/or employees breached its duty through the following acts and/or omissions:

a.  Failure to adequately inspect and/or maintain the subject windows in the H2O Zone in a reasonably safe condition, including, but not limited to, placing and/or maintaining adequate signage for passengers to easily distinguish windows that are closed from

L I P C O N ,   M A R G U L I E S ,   A L S I N A   &   W I N K L E M A N ,   P . A .
W W W . L I P C O N . C O M

those that are fully opened, and/or installing fall prevention window guards, window fall prevention screen, and/or window opening control device in a manner that would prevent small children and other passengers from falling through the subject window; and/or

b.   Failure to promulgate and/or enforce adequate policies and procedures to inspect and/or maintain the subject windows in a manner that allowed passengers to easily distinguish windows that are closed from those that are fully opened; and/or

c.   Failure to promulgate and/or enforce adequate policies and procedures to inspect and/or maintain the subject windows in a reasonably safe condition so that passengers, especially children near the children's water park, do not fall out of windows; and/or

d.   Failure to eliminate and/or modify the hazard(s) which caused the subject incident; and/or

e.   Failure to correct hazardous conditions following prior window fall accidents on Defendant's vessels and/or other vessels reported within the cruise industry.

42. The above acts and/or omissions caused and/or contributed to Chloe's untimely death because the subject incident would not have occurred but for Defendant's failure to adequately inspect and/or maintain the Deck 11 windows aboard the vessel.

43. At all times material hereto, Defendant knew of the foregoing conditions causing Plaintiff's incident and did not correct them, or the conditions existed for a sufficient length of time so that Defendant, in the exercise of reasonable care under the circumstances, should have learned of them and corrected them.  This knowledge was or should have been acquired through Defendant's maintenance and/or inspections, prior incidents, and the reasons alleged in the paragraphs entitled, "Industry Standard…," above.

L I P C O N ,   M A R G U L I E S ,   A L S I N A   &   W I N K L E M A N ,   P . A .
W W W . L I P C O N . C O M

44. As a direct and proximate result of Defendant's negligence,

    a.  Decedent was injured about her body and extremities, suffered physical pain and suffering, mental anguish, and died;

    b.  Decedent's estate lost earnings of the Decedent and lost the benefit of the prospective net accumulations, which might reasonably have been expected but for the Decedent's death.

    c.  The beneficiaries/survivors of the Decedent incurred funeral expenses, suffered loss of financial support, loss of services, lost past and future wages, future loss of support and services, loss of inheritance, sustained mental pain and suffering and loss of the Decedent's companionship and protection, and suffered moral damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendant for all damages recoverable by law and demand a jury trial of all issues so triable.

### COUNT III – NEGLIGENT FAILURE TO WARN

The Plaintiffs re-allege, adopt and incorporate by reference the allegations in paragraphs one (1) through thirty-three (33) as though alleged originally herein.

45. At all times material hereto, it was the duty of Defendant to provide Plaintiff with reasonable care under the circumstances.

46. At all times material hereto, it was the duty of Defendant to warn passengers (like Plaintiffs) of dangers that were known, or reasonably should have been known, to Defendant in places where passengers (like Plaintiffs) are invited to or may reasonably be expected to visit.

47. On or about July 7, 2019, Plaintiffs and Chloe were on Deck 11 aboard Defendant's vessel, which is a place they were invited to by Defendant and a place Defendant reasonably expected Plaintiffs and Chloe to be in during the cruise.

48. On or about July 7, 2019, Defendant and/or its agents, servants and/or employees breached its duty through the following acts and/or omissions:

    a.  Failure to warn passengers, including the family, that the subject windows in the H2O Zone fully opened to the extent that passengers, like Chloe, could fall through the windows; and/or

    b.  Failure to warn passengers, including the family, that the subject windows in the H2O Zone did not have any fall prevention systems in place (e.g., guards or screens) that would prevent small children, like Chloe, from falling through the windows.

49. The above acts and/or omissions caused and/or contributed to Chloe's untimely death because the incident would not have occurred had Defendant and/or its agents, servants and/or employees adequately warned and/or communicated the foregoing to the family.

50. At all times material hereto, the subject windows in the H2O Zone were unreasonably dangerous because (1) they were capable of being fully opened by anyone, including other passengers, and remain fully opened; (2) they did not have adequate fall prevention systems in place (e.g., guards or screens); and (3) they did not have sufficient features to allow passengers, like Mr. Anello, to adequately distinguish windows that were closed from those that were opened, especially for passengers who are colorblind, like Mr. Anello.

51. At all times material hereto, Defendant knew of the foregoing dangerous conditions causing Plaintiff's incident and failed to warn Plaintiff about them, or the conditions existed for a sufficient length of time so that Defendant, in the exercise of reasonable care under the circumstances, should have learned of them and warned about them.  This knowledge was or should have been acquired through Defendant's maintenance and/or inspections, prior incidents, and the reasons alleged in the paragraphs entitled, "Industry Standard…," above.

52. As a direct and proximate result of Defendant's negligence,

    a.  Decedent was injured about her body and extremities, suffered physical pain and suffering, mental anguish, and died;

    b.  Decedent's estate lost earnings of the Decedent and lost the benefit of the prospective net accumulations, which might reasonably have been expected but for the Decedent's death.

    c.  The beneficiaries/survivors of the Decedent incurred funeral expenses, suffered loss of financial support, loss of services, lost past and future wages, future loss of support and services, loss of inheritance, sustained mental pain and suffering and loss of the Decedent's companionship and protection, and suffered moral damages.

**WHEREFORE**, Plaintiffs demand judgment against Defendant for all damages recoverable by law and demand a jury trial of all issues so triable.

Dated: December 11, 2019

                            Respectfully submitted,

                            LIPCON, MARGULIES,
                            ALSINA & WINKLEMAN, P.A.
                            *Attorneys for Plaintiffs*
                            One Biscayne Tower, Suite 1776
                            2 South Biscayne Boulevard
                            Miami, Florida 33131
                            Telephone No.: (305) 373-3016
                            Facsimile No.: (305) 373-6204

                      By:   */s/ Michael A. Winkleman*
                            **JASON R. MARGULIES**
                            Florida Bar No. 57916
                            jmargulies@lipcon.com
                            **MICHAEL A. WINKLEMAN**
                            Florida Bar No. 36719
                            mwinkleman@lipcon.com
                            **JACQUELINE GARCELL**
                            Florida Bar No. 104358
                            jgarcell@lipcon.com